# Illinois Official Reports

## Appellate Court

---

### *People v. Hunt*, 2016 IL App (2d) 140786

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEMOND L. HUNT, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-14-0786 |
| Filed | November 16, 2016 |
| Decision Under Review | Appeal from the Circuit Court of De Kalb County, No. 13-CF-898; the Hon. John F. McAdams, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and April D. Kentala, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Richard H. Schmack, State's Attorney, of Sycamore (Lawrence M. Bauer and Johanne M. Verpil, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SPENCE delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant, Demond L. Hunt, was convicted of two counts of armed robbery (720 ILCS 5/18-2(a)(2) (West 2012)) and one count of aggravated battery (720 ILCS 5/12-3.05(f)(2) (West 2012)). On appeal, he argues that (1) he was not proven guilty beyond a reasonable doubt and (2) his trial counsel was ineffective for failing to tender a jury instruction on accomplice witness testimony. We affirm.

¶ 2                                          I. BACKGROUND

¶ 3    On February 14, 2014, defendant was charged by indictment with two counts of armed robbery, one count of aggravated battery, and one count of unlawful possession of a weapon by a felon. Prior to trial, the weapons charge was severed, and the State proceeded to trial on the remaining counts.

¶ 4    Defendant's jury trial began on April 14, 2014. In his opening statement, the assistant State's Attorney said that the jury "should question" the credibility of State witness Mariah Romero and that she was "a liar" who had lied to the police. He further stated that Romero had a deal with the State, allowing her to plead guilty to obstructing justice rather than face charges for armed robbery, and that the jury "should question her credibility based on all of that." He additionally stated that, if the case were based on Romero's testimony alone, the jury should find defendant not guilty, but that the jury was going to hear testimony from several other witnesses. Defense counsel similarly argued that the Romero was not believable.

¶ 5    We now summarize events according to the victims' testimony. On November 27, 2013, Beth Keller and Britany Garcia were working at the office of the University Heights apartment complex at 1120 Varsity Boulevard in De Kalb. Keller was the property manager, and Garcia worked in the office part-time. Shortly after 4 p.m., a woman came into the office. Keller was on the phone and asked if she could help her. The woman said that she had a question, and Keller asked her to wait one moment. However, shortly before Keller got off the phone, the woman left.

¶ 6    About 2 to 15 minutes later, a man with a rubbery white "Michael Myers" mask came into the office. Keller could see that the man was black, as she could see his skin through the mask's eyeholes. Garcia could not see the man's skin, but his voice sounded like that of a black man. Garcia said that she was 5 feet 4 inches tall and that the man was a couple of inches taller and "a little bit heavier set." The man had a small black revolver in his hands. He repeatedly told Keller and Garcia to get on the floor. Garcia got on her knees and put her hands up. Keller refused to get down and hit the "panic button" to call the police. The man hit her on the right side of her face with the gun, knocking her down. He asked for money, but Garcia said that they could not open the safe. After the man "realized he wasn't going to get anything," he took Keller's purse, which was under her desk, and Garcia's phone before running out the door. Keller's purse contained her engagement ring, wedding band, Social Security card, driver's license, and some credit cards, cash, and cigarettes. Garcia's phone was a white Nokia Lumia. After the man left, Garcia called 911.

¶ 7    Keller later learned that the police recovered the engagement ring but not the wedding band. At trial, she identified a photograph of the ring. Garcia testified that on January 23, 2014, she went to the police department and identified a cell phone as hers based on its contents,

including photographs and music. At trial, Garcia was shown a picture of a gun recovered by the police, and she testified that it appeared to be the same size and color as the robber's gun.

¶ 8    Romero provided the following testimony. Along with defendant, she was charged with armed robbery in connection with the incident. The minimum sentence for that charge was 21 years. She also had a misdemeanor shoplifting charge pending in an unrelated case. Romero had spoken to the assistant State's Attorney twice about her testimony. In exchange for her "truthful testimony" at trial, the State would dismiss the armed robbery charge, and she would be allowed to plead to obstructing justice and receive a sentence of conditional discharge.

¶ 9    On November 27, 2013, Romero was living at 1120 Varsity Boulevard, in apartment 314, with defendant. They were in a dating relationship, and she was currently pregnant with their child. Only Romero's name was on the apartment lease, but they both had keys to the apartment. On the day in question, Romero told defendant that she was going to the apartment complex office because she wanted to "break" her lease and move out. Romero went to the office and saw two women there. The older woman asked her to wait a minute, and Romero left. She returned to her apartment briefly; defendant was not there at that time. Romero then went downstairs to her neighbor's apartment. After a couple of minutes, she saw defendant in the hallway. Two police officers entered the hallway, and defendant "basically fled" from Romero. One of the officers asked her to step out of the apartment and state her name. She gave the false name of Margaret Cartwright because she had a pending warrant for retail theft. The officers took her to the police station and questioned her.

¶ 10    At the station, a detective asked Romero about the robbery that had just occurred in the office. Because of her warrant, Romero initially lied and said that she did not know anything about it. Romero later implicated Edcedric Williams and a man named "John-John" as having been involved in the robbery. She did not have any information suggesting that they participated, and at trial she could not explain why she named them.

¶ 11    At some point in the conversation, the detective said that he knew that Romero was lying about her name and "everything else," so Romero told him her real name. However, she identified Williams in a photo lineup as having been involved in the robbery. She kept lying to protect herself from the warrant, not to protect defendant. The detective exited and entered the room again and said that the police knew everything that had happened, so Romero then implicated defendant in the robbery. Romero also identified him in a photo lineup as having robbed the office. However, she initially identified him as "Demond Oliver," even though she knew that Oliver was not his real last name.

¶ 12    Romero consented to a search of her apartment. At trial, Romero identified pictures of her bathroom that showed a cell phone on the vanity. She had been in the bathroom 20 to 30 minutes before the robbery, and she did not know how the cell phone came to be there. Romero also identified pictures showing a boot that belonged to her, with a gun inside. Romero recognized the gun as belonging to defendant; she had last seen him with it weeks before the robbery. Romero further identified pictures of the following items as belonging to defendant: a clipper bag, a wallet, and two debit cards, an identification card, and a Social Security card all with defendant's name.

¶ 13    Romero agreed that she had lied to the police several times during the course of the investigation. She further agreed that, in light of those lies and the deal she had made with the State, people would have a hard time believing anything she said. However, she said, her testimony that day was the truth.

¶ 14 On cross-examination, Romero agreed that she had also told the police that she was telling the truth. When she first saw the two officers in the apartment building, she told one officer that she had not seen anything suspicious. Romero then told the second officer that she had observed two unfamiliar males, and she described their clothing. At the police station, Romero initially said that she had started off that day in her apartment, with a person named Kiera Evans, and that she then left and went to apartment 218 with a person named Delaney Offord. Romero said that she went to the office to get some change and that, in the hallway, she saw a black male with a black or gray hoodie and a mixed-race Hispanic man. Romero then changed her story and told the police that she started off in apartment 218 with Offord, Offord's sister "Jasmine," and Jasmine's boyfriend. Romero said that, at this point, John-John and a biracial man came in and talked about committing a robbery.

¶ 15 After Romero gave the police her real name, she told them that she had been at the apartment of Wargineele Dixon, Williams' girlfriend, in University Village. Williams was there, and he asked her if she knew of a place that he could rob. Romero suggested her apartment complex, and she went there with him. Williams showed her the handgun he was going to use, and she said that she would stake out the office first. After telling the police this story, Romero identified Williams in a photo lineup. Williams was a black male between 5 feet 4 inches and 6 feet tall.

¶ 16 Romero characterized defendant as living with her in her apartment, but she agreed that he actually just stayed with her on occasion. At the time of the robbery, she believed that she was pregnant, but it had not been confirmed. She knew that defendant also had another girlfriend. In Romero's apartment, defendant's possessions were in a single travel bag. When Romero was arrested, she had $87 cash in her possession.

¶ 17 Romero agreed that it was her understanding that, in order to get the plea deal, her testimony had to be against defendant. Pursuant to the deal, she would not have to spend additional time in jail and would not have to report to a probation officer. Also, her retail theft charge would be dismissed. Romero agreed that being in jail was "not pleasurable" and that prison would likely be worse.

¶ 18 On redirect examination, Romero testified that, when defendant fled from the hallway, he passed one of the officers and went down a staircase in the middle of the hallway. Immediately afterward, Romero testified, an officer was coming toward them and "just missed" defendant. Romero also testified that she had earned the $87 while working at Party City.

¶ 19 Romero then testified that earlier in the day on November 27, 2013, defendant had asked if she knew where the apartment office kept money. Defendant had also asked her to go down and "scope out" the office for him.

¶ 20 On re-cross-examination, Romero agreed that she was not concerned about what happened to defendant. She further agreed that, on the witness stand, she had offered conflicting versions about defendant's movements in the hallway when the officers entered.

¶ 21 De Kalb County Deputy Sheriff Doug Brouwer testified that inmates entering the jail received thorough pat-downs to make sure that they had no drugs or weapons. It was not "common" to find contraband that had not been found up to that point, but "it happened quite a bit." In such situations, the contraband was generally small. On December 5, 2013, he participated in defendant's booking process. When patting down one of the cargo pockets on defendant's pants, Brouwer found a diamond engagement ring. De Kalb police officer Keith Ehrke testified that he transported defendant from the police department to the jail and saw

Brouwer find the ring in defendant's pocket. Ehrke agreed that he did not search defendant before transporting him, even though his department's policies stated that inmates should be searched before transportation.

¶ 22 Police officers testified about recovering from Romero's apartment the items that Romero identified as belonging to defendant, including the gun, as well as the cell phone that Garcia identified as hers.

¶ 23 De Kalb police officer Paul Mott testified as follows. On December 5, 2013, Mott learned that defendant had been taken into custody in Steger, Illinois, by the U.S. Marshals Service. Mott made arrangements to pick up defendant. When Mott and Detective Mark Nachman met up with the marshals, the marshals indicated that defendant had already been searched for weapons. Nachman conducted a pat-down of defendant before putting him in the patrol car.

¶ 24 Upon returning to De Kalb, Mott interviewed defendant. He told defendant of the charges, and defendant said that he had been to De Kalb only one time and was being framed. Defendant next said that he wanted to tell the truth but that he could not. Romero's name came up a couple of times in their conversation. Defendant said that Romero did not know what was going on, and he asked what he could do to keep her "out of this." He later asked how long it would be before she was released and what he needed to do to have her released. Defendant then asked how much time someone would get if he were honest about what happened. Last, defendant said that he was sorry, but he could not implicate himself. Mott did not transcribe his conversation with defendant verbatim but rather wrote a summary of the conversation a few days after defendant's arrest.

¶ 25 On cross-examination, Mott agreed that Keller told him that her purse contained $76, consisting of three $20 bills, one $5 bill, and the remainder in $1 bills. When Romero was arrested, she had $87, consisting of three $20 bills, one $10 bill, two $5 bills, and seven $1 bills. Romero gave the officers many different stories when she was interviewed. Romero mentioned several people who might have been involved in the robbery, including Jon Rounsaville. Mott spoke to Rounsaville and ruled him out as having any involvement. He spoke to Offord's employer, who verified where Offord was that day. Mott could not remember if he or Sergeant Steve Lekkas spoke to Williams. Mott also could not remember if he spoke to Jasmine and could not remember if he asked anyone whether they had seen defendant in the area of the robbery on the day in question.

¶ 26 When Mott transported defendant to the police department, he conducted a "complete custodial search," which was a pat-down of his exterior. Mott did not find anything on defendant. Mott agreed that defendant never said that he robbed anyone or had proceeds from the robbery. Mott also agreed that defendant was worried about what would happen to Romero, who had been in custody for about eight days at the time.

¶ 27 On redirect examination, Mott testified that the police knew that Williams was not involved in the robbery, because he had an alibi.

¶ 28 The State rested, and defendant made a motion for a directed finding, which the trial court denied.

¶ 29 U.S. Marshal Michael Urgo then testified that he arrested defendant on December 5, 2013. He patted down defendant's exterior clothing to search for weapons, and he found a pack of cigarettes in one of defendant's upper pants pockets. In another pocket, Urgo found a plastic

bag with a green leafy substance. During the search, Urgo was wearing gloves that were a little thicker than batting gloves.

¶ 30   Lekkas testified as follows. He was part of the group of officers who responded to the robbery. He spoke to a man named David Billups, who was about to visit apartment 218, and a man named Nick Robinson, who was in apartment 218. He did not question these individuals again after defendant was named as a suspect.

¶ 31   After Romero named Williams as having been involved in the robbery, Lekkas went to Dixon's apartment. Dixon said that Williams had not been there in about one month and that he was living in Chicago with his grandmother. Dixon called the grandmother in Lekkas's presence, and the grandmother said that she had just seen Williams. Dixon allowed Lekkas to search the apartment, and he did not find any men's clothing. Dixon said that she knew Romero and that they had not gotten along since they were arrested together. Dixon said that Romero was lying and probably protecting her own boyfriend. The police never interviewed Williams as a suspect.

¶ 32   In the State's closing argument, the assistant State's Attorney stated that, if Romero were the only witness, the jury should find defendant not guilty. He said that Romero was a liar, some of the things she testified to were probably lies, and she lied when it suited her and to protect defendant. However, he further said that the circumstantial evidence, including the items identified as defendant's found in Romero's apartment and Keller's ring found in defendant's pocket, showed that the State had proven its case beyond a reasonable doubt. Defense counsel argued that the jury could not believe Romero, so there was no credible evidence that defendant committed the crimes.

¶ 33   After more than nine hours of deliberation, the jury found defendant guilty of the charges. On May 15, 2014, defendant filed motions for a new trial and for judgment notwithstanding the verdict. The trial court denied the motions on June 24, 2014.

¶ 34   At the sentencing hearing on August 6, 2014, the trial court found that all three counts merged into one armed robbery count. It sentenced defendant to 23 years' imprisonment. Defendant timely appealed.

¶ 35                                    II. ANALYSIS
¶ 36                           A. Sufficiency of the Evidence
¶ 37   Defendant first argues that he was not proven guilty beyond a reasonable doubt. When faced with a challenge to the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not set aside a criminal conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 38   Defendant's sole challenge to the evidence's sufficiency is that the State failed to prove the element of identity, *i.e.*, that he was the masked robber.

¶ 39    Defendant cites *People v. Ash*, 102 Ill. 2d 485 (1984), and *People v. Wilson*, 66 Ill. 2d 346 (1977). In *Ash*, our supreme court stated that the trier of fact may base a conviction on the uncorroborated testimony of an accomplice, but that such testimony must be cautiously scrutinized on appeal. *Ash*, 102 Ill. 2d at 493. The court stated that if a witness is hoping for a reward from the prosecution, the witness's testimony should not be accepted unless it carries within it an " 'absolute conviction of its truth.' " *Id.* (quoting *People v. Williams*, 65 Ill. 2d 258, 267 (1976)). The court stated that such a standard was not met in the case before it, because the accomplice was seeking a lenient sentence; he admitted that he would " 'do just about anything' " to avoid being incarcerated with the three men he had testified against; he chose to testify only after the prosecution threatened to rescind the agreements that had been negotiated; and the testimony allegedly corroborating the accomplice's testimony did not pertain to who committed the crime. *Id.* at 493-94.

¶ 40    In *Wilson*, our supreme court held that the defendant was not proven guilty beyond a reasonable doubt where the only evidence linking him to a robbery was an accomplice's testimony and the accomplice was promised immunity for his testimony. *Wilson*, 66 Ill. 2d at 350. The court noted that the victim never identified the defendant as the robber and that she described the robber as being seven inches shorter. *Id.*

¶ 41    Defendant argues that, like the accomplice witnesses in *Ash* and *Wilson*, Romero was the only person who identified him as the offender. Defendant notes that Romero testified in exchange for avoiding an armed robbery conviction carrying a minimum sentence of 21 years and that she also avoided an unrelated retail theft charge. Romero was promised that she could plead guilty to obstructing justice and receive 12 months' conditional discharge. Defendant cites Romero's testimony that she could receive the benefit of her bargain if she provided truthful testimony, which she believed required implicating him as the offender. Defendant argues that Romero's inducement to testify against him is enough to call into question whether her testimony bore the "absolute conviction of truth."

¶ 42    Defendant argues that doubts about Romero's veracity were compounded by her exposure as a habitual liar and her inconsistent testimony. Defendant points out that Romero admitted repeatedly lying to the police about her name and involvement in the robbery. He argues that she gave no fewer than six different versions of the events surrounding the crime and identified multiple suspects by description, by name, and from photo arrays. Defendant maintains that, at trial, Romero also gave different accounts of his involvement, including never-before-heard details about his escape from the apartment complex following the robbery. Defendant cites inconsistencies in Romero's testimony about where he was before the robbery, what they talked about, when he was in the apartment building hallway, and whether he walked by any police officers when leaving the hallway. He further argues that Romero stated, for the first time at trial, that she and defendant discussed a potential robbery and that she went to the office to scope it out.

¶ 43    Defendant argues that, as in *Wilson*, the other witnesses and the circumstantial evidence provided information about what happened during the incident but did not corroborate that he was the offender. Defendant points out that Keller and Garcia described the offender only as a black male who was a little bit taller than 5 feet 4 inches and "heavier set." Defendant maintains that, although Garcia testified that the State's photograph of the gun found in Romero's apartment showed a gun of the same size and color as the one used in the incident, Garcia admitted viewing the photograph in preparation for trial, so she might have identified

the gun based on that prior viewing as opposed to her memory of the gun wielded by the offender.

¶ 44 Defendant argues that the police officers' testimony also does not corroborate Romero's testimony. Defendant argues that his personal possessions found in Romero's apartment established only that he might have been there at some point and left some things there. He maintains that the presence of the phone and the gun there implicated him only because Romero linked him to those items. Defendant notes that, although Romero had identified Williams as the offender and Williams matched the offender's race and approximate height, it was unclear whether the police interviewed Williams. Defendant argues that it appears that the police simply credited Dixon's statement that Williams had not been in her apartment for about one month and that Romero was probably lying to protect defendant. Defendant asserts that his own statements to Mott at most indicated that he was concerned about what would happen to Romero. Defendant maintains that, even if his statements could be considered inculpatory, they were unreliable because, rather than recording them verbatim, Mott only summarized them a few days after defendant's arrest.

¶ 45 Regarding the presence of the ring in his pocket, defendant argues that its discovery was dubious given that it was found after he had previously been searched at least four times and only after he had failed to confess. Defendant contends that, although the jury could accept the State's argument that it was unreasonable to infer that the police planted the ring on defendant, the jury could not infer that he was guilty of the robbery based solely on his unexplained possession of the ring. Defendant cites *People v. Housby*, 84 Ill. 2d 415 (1981). There, our supreme court stated that a person's recent and exclusive possession of items stolen in a burglary, without a reasonable explanation, gives rise to the permissive inference that the possession was obtained by the burglary. *Id.* at 422-24. Such an inference is proper if (1) there is a rational connection between a person's recent possession of property stolen in a burglary and that person's participation in the burglary; (2) the person's guilt of the burglary is more likely than not to flow from the recent, unexplained, and exclusive possession of the burglary proceeds; and (3) there is evidence corroborating the person's guilt. *Id.* at 424. Defendant argues that the evidence here satisfied the second *Housby* prong, it did not satisfy the first and third prongs. As to the first prong, defendant argues that his possession of a single item taken during the robbery was not proximate to the time or place of the offense, as he was arrested eight days later and about 80 to 90 miles from the scene. As to the third prong, defendant argues that the only other evidence linking him to the crime was Romero's unreliable accomplice testimony.

¶ 46 We conclude that there was sufficient evidence to prove defendant guilty of the robbery beyond a reasonable doubt. Romero ultimately identified defendant as the robber to the police, and at trial she testified that he was the offender. Romero further testified that she was in a relationship with defendant and that he was the father of her unborn child; she was living at 1120 Varsity Boulevard in De Kalb, and defendant stayed with her sometimes and had a key; the police found items in her apartment, including an identification card, a Social Security card, debit cards, and a gun that belonged to defendant; a phone that police found in her bathroom was not there 20 to 30 minutes before the robbery; earlier on the day of the robbery, defendant asked if she knew where the apartment complex office kept money; and defendant asked her to "scope out" the office for him.

- 8 -

¶ 47        As Romero was an accomplice, her testimony must be cautiously scrutinized, especially considering that her plea deal allowed her to avoid the possibility of at least 21 years' imprisonment for armed robbery. See *Ash*, 102 Ill. 2d at 493; see also *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 27 (an accomplice's testimony should be viewed with suspicion and accepted only with great caution, especially if the witness was promised leniency or immunity). However, Romero's testimony was corroborated by Keller's and Garcia's testimony and by physical evidence. Specifically, Keller and Garcia testified that a woman came into the office and left and that the robber entered shortly afterward. They testified that the robber was a black male holding a black revolver and Garcia testified that the revolver looked similar to the gun police found in Romero's apartment. Garcia also testified that the robber took her Nokia Lumia cell phone, and the evidence established that it was the phone found in Romero's bathroom. Defendant's wallet and personal possessions were found in Romero's apartment, and, though he argues that they show only that he might have been there at some point, the nature of the items, including his identification card and two debit cards, circumstantially indicates that he was living or staying in the apartment on the day of the robbery. Keller testified that the assailant stole her purse, which contained her engagement ring, and she identified the ring as the one that police found in defendant's pocket eight days after the incident. Defendant's statements to Mott indicated that he had an ongoing relationship with Romero. Moreover, though defendant did not confess, he offered somewhat inculpatory statements by saying that he wanted to tell the truth but could not, stating that Romero did not know what was going on and asking how much time someone would get if he were honest about what happened.

¶ 48        Thus, unlike in *Ash* and *Wilson*, aside from Romero's testimony, there was corroborating evidence linking defendant to the crime, including that Keller's ring was found in his pocket. Although defendant seems to take the position that we cannot consider the ring's presence because the circumstances do not satisfy the *Housby* test, that test applies only to instructions advising a jury of the inferences it may draw. *People v. Richardson*, 104 Ill. 2d 8, 12 (1984). Here, defendant has not challenged any jury instructions on this issue, nor was the jury even instructed about a presumption regarding robbery proceeds. Moreover, in closing argument, the defense brought up the possibility that someone planted the ring on defendant or that Romero gave it to him after the robbery occurred. It was up to the jury to determine whether to accept or reject the evidence and the theories presented at trial. *People v. Washington*, 375 Ill. App. 3d 243, 259 (2007).

¶ 49        As for the police investigation of Williams, the defense highlighted through its cross-examination and closing argument the limited nature of that investigation, and it was the jury's role to weigh that evidence. See *People v. Frazier*, 2016 IL App (1st) 140911, ¶ 11. Similarly, both the prosecution and the defense emphasized Romero's deal with the State and her credibility problems, with the prosecution stating in closing that she was a "liar" and probably told some lies on the witness stand. "[W]hile subject to careful scrutiny, the testimony of an accomplice, whether it is corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt." *People v. McLaurin*, 184 Ill. 2d 58, 79 (1998). The evidence against defendant cannot be characterized as overwhelming, but considering Romero's testimony, along with the corroborating evidence mentioned, a rational trier of fact could have determined

that defendant committed the crime beyond a reasonable doubt.

¶ 50                              B. Ineffective Assistance of Counsel

¶ 51        Defendant next argues that his trial counsel was ineffective for failing to tender the pattern jury instruction regarding accomplice witness testimony. For a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). As to trial counsel, the defendant must first establish that, despite the strong presumption that counsel acted competently and that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, the defendant must establish prejudice by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors. *People v. Valdez*, 2016 IL 119860, ¶ 14. A failure to satisfy either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 35. Where, as here, a claim of ineffective assistance was not raised in the trial court, we review the issue *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 52        Defendant argues that his trial counsel should have tendered Illinois Pattern Jury Instructions, Criminal, No. 3.17 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 3.17). That instruction states:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." *Id.*

The instruction should be given if the totality of the evidence and the reasonable inferences derived from the evidence establish probable cause to believe that the witness participated in the crime, as either a principal or an accomplice. *People v. Davis*, 353 Ill. App. 3d 790, 795 (2004). The instruction's purpose is to warn the jury that the witness might have a strong motivation to provide false testimony for the State in exchange for immunity or some other lenient treatment. *Id.* at 798. When accomplices testify, courts have found no valid reason for not requesting IPI Criminal 4th No. 3.17. *Id.* at 795.

¶ 53        Defendant argues that the totality of the evidence presented at trial was sufficient to establish probable cause that Romero participated in the armed robbery, so the jury should have been given IPI Criminal 4th No. 3.17. The State concedes that trial counsel's failure to tender the instruction was objectively unreasonable and thereby satisfies the first prong of the *Strickland* test.

¶ 54        The question remains whether the failure to request the instruction prejudiced defendant, as required by *Strickland*'s second prong. In *People v. McCallister*, 193 Ill. 2d 63, 90 (2000), our supreme court held that, even though trial counsel did not request the accomplice-witness instruction, the defendant failed to establish a reasonable probability that the trial would have resulted differently had the instruction been given. It based this conclusion on (1) the inherent weaknesses of the defendant's own testimony, (2) the strength of the evidence offered against the defendant apart from the accomplice witness's testimony, and (3) the instructions the jury actually received. *Id.* at 91.

- 10 -

¶ 55     Defendant analogizes his case to *People v. Wheeler*, 401 Ill. App. 3d 304 (2010), and *People v. Campbell*, 275 Ill. App. 3d 993 (1995). In *Wheeler*, the court concluded that defense counsel's error in failing to tender the accomplice-witness instruction was not harmless because the evidence was closely balanced and the State's case rested upon an accomplice as its key witness. *Wheeler*, 401 Ill. App. 3d at 314. The court stated that, without the accomplice's testimony, there were no witnesses who could identify the defendant as the shooter and there was no physical evidence linking the defendant to the crime. *Id.*

¶ 56     In *Campbell*, two accomplices, who were dating each other, testified against the defendant pursuant to deals with the State. *Campbell*, 275 Ill. App. 3d at 998. Although there was evidence that the defendant was at the scene of the crime, only the accomplices' testimony identified the defendant as the perpetrator of the offense. *Id.* The appellate court concluded that defense counsel's failure to tender the accomplice-witness instruction constituted ineffective assistance of counsel. *Id.* at 999.

¶ 57     As the State points out in its brief, *Zambrano* is also relevant to this issue. There, the court held that defense counsel's failure to submit the accomplice-witness instruction prejudiced the defendant because the accomplice was testifying under a grant of use immunity and his testimony was the only evidence establishing the defendant's participation in the crime. *Zambrano*, 2016 IL App (3d) 140178, ¶ 32.

¶ 58     Defendant argues that, as in the above-cited cases, here the State's case relied heavily on the testimony of its accomplice witness, Romero. Defendant argues that she provided the only evidence that he could access her apartment in her absence, that he was in De Kalb on the day of the offense, that he possessed the gun found in her apartment and used in the robbery, and that he expressed an intent to rob the apartment complex office and had done so. Defendant maintains that these facts amount to the motive, means, and opportunity to commit the offense. Defendant contends that, without Romero's testimony, the State had nothing to prove that he was the robber, nor could it establish more than a tenuous link between him, the gun in Romero's apartment, and the proceeds of the robbery. Defendant maintains that his alleged statements to Mott were unreliable and only arguably inculpatory. Defendant also argues that, although the State "disingenuously" encouraged the jury to question Romero's credibility because she was a "liar," the jury had to believe at least some of her testimony for the State to meet its burden.

¶ 59     After considering the record in this case, we conclude that defendant has failed to sufficiently establish that the results of the trial would have been different had defense counsel tendered the accomplice-witness instruction. Looking at the *McCallister* factors (see *supra* ¶ 54), the first factor does not apply because defendant did not testify. The second factor involves the strength of the evidence offered against the defendant apart from the accomplice witness's testimony. *McCallister*, 193 Ill. 2d at 91. As discussed, there was corroborating evidence linking defendant to the crime. Keller and Garcia described the perpetrator as a black male, taller than 5 feet 4 inches, and heavier set. The presence of defendant's personal possessions in Romero's apartment, including his wallet with his identification, Social Security, and debit cards, circumstantially indicates that he was staying or living in the apartment on the day in question. The victims described the offender as holding a black revolver, and Garcia testified that the revolver looked similar to the gun police found in Romero's apartment. Garcia's cell phone, which she testified that the robber took, was also found in Romero's apartment. Keller testified that the robber took her purse, which contained

her engagement ring, and she identified as hers the ring found in defendant's pocket eight days after the robbery. Defendant's conversation with Mott contained somewhat inculpatory statements, including that he wanted to tell the truth but could not, that Romero did not know what was going on, and that he wanted to know how much time someone would get if he were honest about what happened. Finally, the police investigated the other men Romero initially implicated in the robbery, but the police ruled them out as suspects.

¶ 60       The third *McCallister* factor considers the instructions the jury actually received. *Id.* The jury here received the pattern instruction on witness credibility, which states:

> "Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case." Illinois Pattern Jury Instructions, Criminal, No. 1.02 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 1.02).

This general instruction on witness credibility alone will not cure the failure to request the accomplice-witness instruction. *McCallister*, 249 Ill. 2d at 96. However, in *McCallister*, our supreme court stated that "the fact that the jury was told to consider, in general, the bias, interest or prejudice of the witnesses may be considered as one factor, *among others*, which establishes that [the] defendant was not prejudiced by his trial counsel's failure to tender the accomplice witness instruction." (Emphasis in original.) *Id.* at 97.

¶ 61       Here, the jury was additionally given Illinois Pattern Jury Instructions, Criminal, No. 3.11 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 3.11), which pertains to prior inconsistent statements and provides:

> "The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind ordinarily may be considered by you for the limited purpose of deciding the weight to be given to the testimony you heard from the witness in this courtroom."

¶ 62       Moreover, the assistant State's Attorney specifically argued in both his opening and closing statements that the jury should question Romero's credibility, that she was "a liar" who lied to the police, and that, if Romero were the only witness, the jury should find defendant not guilty. In his opening statement and in his direct examination of Romero, he highlighted that she had a deal with the State whereby, in exchange for her testimony at trial, the armed robbery charge against her would be dismissed and she could plead guilty to obstruction of justice and receive conditional discharge. Defense counsel also argued in his opening and closing statements that Romero was not believable, and, in his cross-examination of her, he brought out the conflicting versions of events that she had given to the police and in her testimony. Defense counsel similarly emphasized Romero's deal with the State, including her belief that the agreement required her to testify against defendant. As stated, the purpose of the accomplice-witness instruction is to warn the jury that the witness might have a strong motivation to provide false testimony for the State in return for some form of lenient treatment (*Davis*, 353 Ill. App. 3d at 798), and the attorneys' arguments, coupled with the instructions that were given, clearly warned the jury that it should view Romero's testimony with suspicion.

¶ 63    In sum, considering (1) the evidence corroborating Romero's testimony; (2) the instructions that the jury did receive, namely IPI Criminal 4th No. 1.02 on general witness credibility and IPI Criminal 4th No. 3.11 on prior inconsistent statements; and (3) the fact that, in their opening and closing statements and in their examinations of Romero, the parties repeatedly encouraged the jury to question Romero's credibility, we conclude that defendant cannot show that he was prejudiced by his counsel's failure to tender the instruction on accomplice-witness testimony.

¶ 64    The above-mentioned considerations distinguish this case from *Wheeler*, *Campbell*, and *Zambrano*. Specifically, in those cases there was no physical evidence linking the defendants to the crimes, the juries did not receive IPI Criminal 4th No. 3.11, and those trials did not include repeated assertions by both parties that the juries should question the accomplices' credibility. Defendant argues that arguments by the parties cannot substitute for jury instructions from the court. See *People v. Carini*, 151 Ill. App. 3d 264, 280 (1986) (instructing the jury as to matters of law is a judicial function exclusively within the province of the trial court). We have no quarrel with this general assertion. However, accepting that the failure to give the accomplice witness instruction was unreasonable, under *Strickland* and *McCallister* defendant was still required to show a reasonable probability that the trial would have resulted differently had his counsel tendered the instruction. In making this assessment, we considered the totality of the circumstances (see *People v. Furdge*, 332 Ill. App. 3d 1019, 1028 (2002)), which includes, among other things, the parties' examinations of the witnesses and their remarks to the jury. See also *Campbell*, 275 Ill. App. 3d at 996-97 (stating that counsel's arguments can be considered in the analysis). Notably, we also considered the evidence apart from Romero's testimony and the instructions that the jury did receive. Based on the record before us, defendant cannot show that he was prejudiced by his counsel's failure to tender the instruction on accomplice-witness testimony, and he therefore cannot succeed on his claim that he received ineffective assistance of counsel.

¶ 65                              III. CONCLUSION

¶ 66    For the reasons stated, we affirm the judgment of the De Kalb County circuit court. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2014); see also *People v. Nicholls*, 71 Ill. 2d 166, 179 (1978).

¶ 67    Affirmed.