2022 IL App (1st) 201274-U

THIRD DIVISION
December 2, 2022

No. 1-20-1274

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 19 CR 3051 |
| | ) | |
| TREMANN TREADWELL, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice McBride and Justice Gordon concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Affirming the judgment of the circuit court of Cook County where the admission of other-crimes evidence and the denial of a continuance were not improper.

¶ 2     Following a bench trial, defendant Tremann Treadwell was convicted of the attempted criminal sexual assault and aggravated criminal sexual abuse of his 16-year-old biological daughter T.T. and sentenced to 12 years' imprisonment.  On appeal, he contends that the trial court abused its discretion by admitting other-crimes evidence.  Defendant also argues that the trial court erred when it denied his request for a continuance to compel the attendance of two defense witnesses or, alternatively, that his counsel was ineffective for failing to timely subpoena the witnesses.  For the reasons discussed herein, we affirm.

¶ 3                                        BACKGROUND

¶ 4                          *Motion to Allow Other-Crimes Evidence*

¶ 5     Defendant was charged with two counts of attempted criminal sexual assault and two counts of aggravated criminal sexual abuse of his biological daughter T.T. (19 CR 3051). Defendant was also the subject of a criminal complaint relating to his stepdaughter J.A. (19 CR 3052). Prior to trial, the State filed a motion to allow other-crimes evidence, wherein the State described the two criminal cases, as well as a third incident involving J.A.'s friend, T.M. The State sought "to use the facts of each case in their respective trials as well as the noncharged matter in both of the cases."

¶ 6     The first case (19 CR 3051) involved an incident on October 26, 2018, where defendant allegedly grabbed his daughter T.T.'s breast and attempted to pull down her pants. In the second case (19 CR 3052), defendant's stepdaughter J.A. alleged that from December 2008 through December 2012 – when J.A. was between the ages of 10 and 15 – defendant repeatedly lay on top of her and grinded his penis against her buttocks, touched her breast and vagina over her clothing, and attempted to kiss her on the mouth. The State also described an uncharged incident involving T.M. in December 2012, when she was 12 years old. T.M. alleged that defendant rubbed her thigh while she shared a bed with J.A. during a sleepover at defendant's residence.

¶ 7     In the motion, the State contended that the other-crimes evidence was relevant to demonstrate propensity under section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2020)), as well as intent and motive. As to section 115-7.3, the State asserted that the acts were sufficiently close in time to each other and that the cases were similar, *i.e.*, the victims were all minor females and the incidents occurred in defendant's residence. The State also noted that both J.A. and T.M. alleged that they awoke to find defendant touching them.

The State argued that an uncharged act – the incident with T.M. – is admissible and that allowing the jury to hear of only the attack against T.T. (or J.A.) could create the false impression that such an attack was an isolated incident.

¶ 8        Defense counsel contended that T.T. – a teenager who admittedly smoked marijuana – was resentful of defendant acting as a disciplinarian after he returned to the family home following a period of incarceration.  Counsel also stated that law enforcement was involved after an incident where J.A. damaged the residence when her parents refused to drive her to a store. Counsel suggested that the alleged victims knew that defendant was on parole, and their allegations were a concerted attempt to have him removed from the home.  Although defense counsel acknowledged that uncharged offenses may be used as other-crimes evidence, counsel noted that defendant was not criminally charged as to the purported incident with T.M.

¶ 9        The trial court granted the State's motion and allowed the admission of other-crimes evidence for purposes of intent, motive, and propensity.  Defendant filed a motion to reconsider, arguing, in part, that the other-crimes evidence was not proximate in time and was factually dissimilar.  He also contended that the admission of such evidence would create the risk of "mini-trials" and would violate his due process rights.  The motion to reconsider was denied.

¶ 10                                *Bench Trial*

¶ 11      The State elected to proceed with the case involving T.T. (19 CR 3051).  The testimony and other evidence presented at the bench trial included the following.

¶ 12                                     T.T.

¶ 13      T.T. testified that, in October 2018, she was 16 years old and was living with her siblings and her parents – defendant and her mother Yoko A. (Yoko).  In the early morning hours of October 25, 2018, she awoke to defendant reaching over her, ostensibly grabbing a bottle of

lotion from near her bed. T.T. did not hear him enter the room, and she felt something touch her.

¶ 14    After attending school on October 25, 2018, T.T. went to her friend Kevin's house. T.T. and Kevin smoked marijuana, and then she returned home shortly before her 9:00 p.m. curfew. At that point, defendant was "on [her] case" and required her to perform household chores. According to T.T., defendant's pants were sagging; she confirmed that he has a prosthetic leg. When T.T. completed the chores, she went to her bedroom.

¶ 15    T.T. testified that defendant then called her to his room and gave her two marijuana "blunts." T.T.'s sister, Ta.T., joined her in her bedroom. T.T. denied that she and Ta.T. smoked marijuana together that evening.

¶ 16    A few hours later, as the sisters lay on T.T.'s bed, defendant entered the room and directed Ta.T. to leave. Defendant closed the bedroom door. T.T. was dressed in undergarments, a tank top, and pajama bottoms. Defendant was wearing "half down" jeans and an unbuckled belt. As defendant sat on the bed, T.T. viewed his exposed penis. Defendant told T.T. she deserved a "whooping" for coming home late; he instructed her to lay on his lap. T.T. then stood up, and defendant stood up. She testified that he was facing her as he placed his hand on her chest. She felt "scared" as defendant's palm was touching her breast.

¶ 17    According to T.T., defendant grabbed her shoulders and stated, "[I am] not going to hurt you, baby girl." She testified that defendant turned her to face the wall. He then placed one hand on the wall and his other hand underneath her clothing and attempted to pull down her underwear. When T.T. reached for the door, he placed her in a chokehold with his arm wrapped around her neck. She screamed, and he loosened his arm.

¶ 18    T.T. testified that she was in pajamas and was not wearing shoes as she ran four blocks to Kevin's residence and banged on his door. When Kevin answered, T.T. told him that her father

"tried to rape" her. Kevin called 911, and T.T. spoke with the police. T.T. did not return home; she resided with her grandparents for the next two months. In December 2018, T.T. and her stepsister J.A. were interviewed at the Children's Advocacy Center (CAC). Upon questioning by the assistant State's attorney, T.T. testified that defendant had previously "whooped" her with a belt, but the incident at issue was the only instance where he directed her to lay on his lap, touched her breast, told her to not be scared, or called her "baby girl." On cross-examination, she testified she had a "gut feeling" that "something bad" would happen that night.

¶ 19                                            Kevin Sales

¶ 20    Kevin Sales (Kevin) testified that on October 25, 2018, T.T. arrived at his apartment at approximately 2 p.m. or 3 p.m., and they smoked marijuana together. She left at 8 p.m. or 9 p.m. and walked to her home. In the early morning hours of October 26, 2018, Kevin heard T.T. banging on his apartment door. When he opened the door, he observed that T.T.'s face was streaked with tears, and her eyes were red; she was not wearing shoes.

¶ 21    T.T. told Kevin to call the police, as she believed defendant was "trying to rape" her. After he initially spoke with the police, he handed the telephone to T.T. According to Kevin, T.T. was "hysterical" as she spoke with police on the phone and later in person.

¶ 22                              Officer Renee Pietrusiewicz

¶ 23    Chicago Police Officer Renee Pietrusiewicz (Officer Pietrusiewicz) testified that she and her partner responded to an emergency call at approximately 2 a.m. on October 26, 2018, regarding a criminal sexual assault. Officer Pietrusiewicz spoke with Kevin and T.T. T.T. was shaking and "choked up" as she detailed what had happened to her. Officer Pietrusiewicz was present as T.T. called her mother; she cried and was "kind of hysterical" during the call. T.T. told Officer Pietrusiewicz that she did not wish to return home.

¶ 24                                    T.M.

¶ 25    T.M. testified that, in December 2012, she was 12 years old and was a friend of defendant's stepdaughter J.A. She knew J.A.'s family her entire life, and she considered Yoko and defendant to be like an aunt and uncle. On December 27, 2012, T.M. went to a sleepover in J.A.'s bedroom. As she slept with J.A. in her bed, T.M. felt someone touch her leg. She moved to signal that she was awake, and the individual left. Seconds later, the individual reentered the room and touched her leg. T.M. recognized him as defendant. When she moved again, he left the room a second time. T.M. testified that defendant had "swiped" her inner thighs.

¶ 26    T.M. testified that she woke up J.A., and the two girls went to the bathroom to talk. T.M. relayed what happened, and J.A. told "all the stuff that had happened with her." At that point, defendant picked the lock and entered the bathroom. According to T.M., defendant asked J.A. if she had "seen something." T.M. left defendant's residence, walked to her aunt's home, and described the incident. T.M.'s family then arrived at her aunt's residence.

¶ 27    During cross-examination, T.M. testified that she was interviewed at the CAC in February 2019. T.M. told the interviewer that, as she slept in J.A.'s bed in 2012, her cellphone was charging next to the bed using a borrowed charger. T.M. thought that the individual who had entered J.A.'s bedroom may have been looking for the charger. Although T.M. did not observe defendant removing the charger, the charger was gone when he reentered the bedroom.

¶ 28                                    J.A.

¶ 29    J.A. testified that in the fall of 2009, she was nine years old and resided with her mother Yoko, her sisters, and defendant, who was her stepfather. She described different incidents involving defendant. On one occasion, she awoke to find defendant touching her buttocks over her clothes and moving her from "side to side." Another time she awoke to defendant kissing

her on the mouth.  As she slept on the couch on a different occasion, he touched her vagina under her clothes.  When J.A. looked at him, he "jumped and started back doing what he was doing."

¶ 30    According to J.A., the incidents continued when the family moved to a new residence the following year.  She testified that defendant would touch her chest and buttocks and lay on top of her in her bedroom; she felt his penis pressing against her buttocks.  After another family move when she was 12 years old, she told her mother what had happened with defendant.  J.A. testified that defendant subsequently gave her $5 and stated, "that s*** won't happen again."

¶ 31    J.A. testified that the incidents mostly stopped after the family moved again when she was 14 years old.  On one occasion, however, defendant rubbed his penis against her thigh while she was cutting his hair.  Defendant subsequently was incarcerated (for an unrelated offense).

¶ 32    During cross-examination, J.A. testified that she never had a good relationship with defendant.  She testified that there were no rules in her home, and she could do whatever she wanted.  She was questioned regarding an incident in December 2017 during which the police were called to her home; she was holding a knife and had damaged property.  J.A. testified she had engaged in such conduct since defendant "was there and I did not want him around me."

¶ 33                          Allen Treadwell and Antron Grisby

¶ 34    After the State rested and the trial court denied defendant's motion for a directed finding, the defense called Allen Treadwell (Allen), defendant's cousin.  Allen resided in an apartment in the same building as defendant.  Allen testified regarding a conversation he had with defendant at approximately 6 p.m. on October 25, 2018.[1]  According to Allen, defendant discovered that T.T. had spent the prior night at her boyfriend's residence.  Defendant asked Allen and another

---

[1] Although he referenced October 25, 2018, Allen's testimony appears to relate to events which occurred on October 24, 2018.

relative, Antron Grisby (Grisby), to ride with him to the boyfriend's home to "get his daughter." When they arrived, T.T. was not there.

¶ 35    A few hours later, the group returned to T.T.'s boyfriend's residence, and defendant entered the building.  After 5 or 10 minutes, defendant exited the building, holding T.T.'s hand. According to Allen, T.T. broke loose and started running.  Grisby chased her and brought her back to the vehicle.  When the group returned home, Allen heard defendant bring T.T. upstairs and "[whip] her butt" as she cried.

¶ 36    Grisby's testimony was substantially similar to the testimony provided by Allen. Both witnesses were cross-examined regarding their prior criminal convictions.

¶ 37                            Petition for Rule to Show Cause

¶ 38    Defense counsel indicated that she thought the State intended to call Yoko and her minor daughter Ta.T. to testify.  When that did not occur, the defense served two subpoenas to testify on Yoko: one for her and one for Ta.T.  Neither Yoko nor Ta.T. complied with the subpoenas.

¶ 39    Defendant subsequently filed a petition for rule to show cause against Yoko.  After hearing testimony from the investigator who served the subpoenas, the trial court issued an arrest warrant for Yoko but denied defense counsel's request for a continuance.

¶ 40                                    Defendant

¶ 41    Defendant testified that he picked up T.T. at her boyfriend's home on October 24, 2018, and they returned home.  As he attempted to speak with her regarding staying out on a school night, she packed her clothing as if she were moving out of the residence.  Defendant removed his belt and started "disciplining" her.

¶ 42    On the following evening, T.T. had not returned home by 9:00 p.m., so defendant repeatedly called her cell phone, but she did not answer.  When she arrived home "late" at

9:30 p.m., he told her she would be required to perform chores for the next five days. According to defendant, she did not perform chores that evening as the home had already been cleaned. Defendant went to his room and fell asleep.

¶ 43    At 2:00 a.m., defendant woke up to use the restroom. He observed T.T. and Ta.T. together, which he considered strange since they usually did not "get along." He subsequently performed a "hop-through" of the residence, as he was not wearing his prosthetic leg. He smelled marijuana and confronted T.T. about smoking with Ta.T., which T.T. denied. After putting on his prosthetic leg and pants, he found T.T. alone in her room. He told her she made him look like a "damn fool" by not following rules, *i.e.*, breaking curfew and smoking marijuana.

¶ 44    Defendant testified that as he started reaching for his belt to "discipline" T.T., she reached for the doorknob. He tried to grab her shoulder, but she slipped away. He then slipped and fell, and T.T. ran out of the residence. Defendant testified that his prosthetic leg was "on" but was not fully attached. He drove around and looked for her unsuccessfully.

¶ 45    Defendant testified that he was incarcerated from January 2014 until September 2017. T.T. wrote him letters during his incarceration, and his relationship with her was initially "[g]reat" after he returned home. Their relationship soured, however, when T.T. would not follow his rules. Defendant testified that T.T.'s mother, Yoko, did not enforce the rules.

¶ 46    Defendant denied inappropriately touching his stepdaughter J.A. or kissing her on the lips. He testified that Yoko called the police when J.A. destroyed items in their home.

¶ 47    As to the alleged 2012 incident with J.A.'s friend T.M., defendant testified that he had arrived home in the early morning and slept for five hours. Defendant testified that he was unaware that T.M. was sleeping over with J.A. The next morning, he left the residence to purchase marijuana. Upon returning home, he was shot by T.M.'s father; his leg was amputated

due to injuries from the shooting. Defendant testified that he had a financial dispute with T.M.'s father. Defendant also testified that he had a physical relationship with T.M.'s mother.

¶ 48                           *Conclusion of the Trial*

¶ 49    After defendant's testimony, his counsel indicated that she wished to call Ta.T. and Yoko to testify, but they were not present. The trial court denied counsel's request to delay the trial.

¶ 50    Following closing arguments, the trial court noted that it found T.T., J.A., and T.M. to be credible and defendant to be not credible. Defendant was convicted of two counts of attempted criminal sexual assault and one count of aggravated criminal sexual abuse.

¶ 51    Defendant filed an initial motion and then an amended motion to reconsider its guilty findings or, in the alternative, for a new trial. In the amended motion, defendant argued, in part, that the admission of other-crimes evidence was improper. The trial court denied the amended motion and sentenced defendant to 12 years' imprisonment. Defendant filed this timely appeal.

¶ 52                               ANALYSIS

¶ 53    Defendant advances two primary arguments on appeal. First, he contends that the trial court abused its discretion by allowing the other-crimes evidence. Second, defendant asserts that the trial court abused its discretion when it denied a continuance to allow time for defendant to compel the presence of Yoko and Ta.T. In the alternative, defendant asserts that his trial counsel's failure to timely subpoena those two witnesses constituted ineffective assistance.

¶ 54                         *Other-Crimes Evidence*

¶ 55    Under Illinois common law, other-crimes evidence is generally inadmissible if offered only to demonstrate the defendant's propensity to commit the charged crime. *People v. Johnson*, 406 Ill. App. 3d 805, 808-09 (2010). Evidence of other crimes is admissible if it is relevant for any purpose other than to demonstrate the defendant's propensity to commit a crime. *People v.*

*Pikes*, 2013 IL 115171, ¶ 11.  See also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).  Other-crimes evidence is admissible to prove intent, *modus operandi*, identity, motive, absence of mistake, "and any material fact other than propensity that is relevant to the case."  *People v. Donoho*, 204 Ill. 2d 159, 170 (2003).

¶ 56    When the trial court finds some relevance in other-crimes evidence, it must conduct a balancing test.  *People v. Gwinn*, 366 Ill. App. 3d 501, 515 (2006).  Even where relevant, other-crimes evidence should not be admitted if its probative value is substantially outweighed by its prejudicial effect.  *Pikes*, 2013 IL 115171, ¶ 11.  See Ill. R. Evid. 403 (eff. Jan. 1, 2011) ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

¶ 57    The determination is not whether the other-crimes evidence is prejudicial, as such evidence is "unquestionably prejudicial to a defendant."  *People v. Perez*, 2012 IL App (2d) 100865, ¶ 45.  Accord *People v. Hendricks*, 137 Ill. 2d 31, 52 (1990) (noting that "[e]vidence of uncharged misconduct by the defendant undermines the presumption of innocence").  See *People v. Maya*, 2017 IL App (3d) 150079, ¶ 66 (observing that "all evidence is prejudicial, in that it is intended to persuade the finder of fact in one direction or the other").  "[T]he concern is with prejudice which is undue or unfair, the type of prejudice that 'speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.' "  *Id.*, quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

¶ 58    Under common law, if the trial court is satisfied that the other-crimes evidence is relevant to a material question unrelated to propensity, and the court then determines that the probative

quality of the evidence outweighs the prejudice to the defendant, the evidence may be admitted. *People v. Clark*, 2015 IL App (1st) 131678, ¶ 28. Section 115-7.3 of the Code, however, "implemented a change to the common law rule specifically in sex offense cases." *Donoho*, 204 Ill. 2d at 173-74. Section 115-7.3 permits the State, in sex offense prosecutions, to introduce evidence of other sex offenses by the defendant. *People v. Cerda*, 2014 IL App (1st) 120484, ¶ 181. Such evidence "may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(b) (West 2020). "Relevant matters" under the statute "include allowing evidence of other-crimes to show a defendant's propensity to commit sex offenses." *People v. Williams*, 2013 IL App (1st) 112583, ¶ 36, citing *Donoho*, 204 Ill. 2d at 176.

¶ 59     Under section 115-7.3, where the other-crimes evidence satisfies the threshold requirement of relevance and contains probative value, it is presumed to be admissible if its probative value is not substantially outweighed by its prejudicial effect. *Id.* ¶ 37. In weighing the probative value of the evidence against undue prejudice to the defendant, section 115-7.3 provides that the court may consider: "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2020).

¶ 60     The admissibility of evidence rests within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Pikes*, 2013 IL 115171, ¶ 12. See also *Cerda*, 2014 IL App (1st) 120484, ¶ 183 (applying an abuse of discretion standard to a ruling on other-crimes evidence under section 115-7.3). An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *People v. Baez*, 241 Ill. 2d 44, 106 (2011).

¶ 61     In the instant case, the charged offense against T.T. and the other-crimes offenses were

similar. Each incident involved defendant touching the breasts, buttocks, or vagina of a minor female with whom he stood in a position of trust – as her father, her stepfather, or her close family friend. The offenses all occurred within the defendant's residence, and defendant appears to have inappropriately touched the girls while acting as if he were engaged in non-sexual conduct, *i.e.*, "disciplining" his daughter, grabbing a bottle of lotion, searching for a phone charger, getting his hair cut, etc.

¶ 62     As to proximity in time, the incident with T.M. occurred during the same period as the abuse of J.A. Moreover, as the State observes, defendant presumably had little or no access to T.M. after her father shot defendant following the purported touching incident. Although the events with T.T. occurred years later in 2018, we note that defendant testified that he was incarcerated from January 2014 to September 2017. See *People v. Everhart*, 405 Ill. App. 3d 687, 700 (2010) (noting that "the prior offense occurred nearly 11 years before the current one, but if we discount the time defendant was in prison, the gap in time is less than six years," which the appellate court considered not "too remote"). In any event, the "number of years separating the other offense and the charged act do not, standing alone, control whether the prior bad act evidence ought to be admitted." *People v. Smith*, 2015 IL App (4th) 130205, ¶ 29.

¶ 63     Defendant contends that he was "inappropriately forced to defend himself in 'mini-trials' of the allegations by J.A. and T.M." We find this argument unpersuasive. We recognize that, even when relevant and probative, other-crimes evidence must not become a focal point of the trial. *People v. Smith*, 406 Ill. App. 3d 747, 755 (2010). The proceedings herein, however, did not devolve into "mini-trials" of these collateral offenses. *E.g.*, *People v. Bedoya*, 325 Ill. App. 3d 926, 940-41 (2001) (reversing the defendant's conviction and remanding for a new trial where the State presented 7 witnesses and 27 exhibits regarding the other-crimes evidence). While J.A.

and T.M. each testified, the majority of the testimony – from T.T., her friend Kevin, and a responding police officer – was focused on the incident with T.T.

¶ 64    Although not necessary for our analysis, we observe that certain potential risks associated with the admission of other-crimes evidence, *e.g.,* the possibility of juror confusion, do not readily apply with respect to this bench trial.  See *Smith*, 406 Ill. App. 3d at 756.  We presume that a trial judge knows and follows the law unless the record demonstrates otherwise.  *People v. Jordan*, 218 Ill. 2d 255, 269 (2006).  Based on our review of the record, the trial court herein properly weighed the probative value of the evidence against undue prejudice to defendant.

¶ 65    In light of the foregoing, we find that the trial court did not abuse its discretion in allowing the State to present other-crimes evidence to demonstrate propensity under section 115-7.3 of the Code.  We thus need not reach defendant's argument that the trial court erred in admitting other-crimes evidence on the issue of intent and motive.  See *People v. Arze*, 2016 IL App (1st) 131959, ¶ 102.  We now turn to the second claim of error.

¶ 66                              *Denial of Continuance*

¶ 67    Defendant contends that the trial court erred in denying defendant a continuance during the trial to allow the defense to secure the testimony of two witnesses:  Ta.T. and Yoko. According to defendant, Ta.T. would testify that she smoked marijuana with T.T. prior to the incident and that she did not hear screams from T.T.'s bedroom during the incident.  Yoko would testify that J.A. never reported any abuse to her, contradicting J.A.'s testimony.

¶ 68    As an initial matter, the State argues that defendant forfeited this issue by failing to raise the issue in his amended posttrial motion (see *People v. Burnett*, 2015 IL App (1st) 133610, ¶ 75), and thus the plain error doctrine applies.  An error is cognizable and remediable as plain error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the

14

error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Clark*, 2016 IL 118845, ¶ 42. Defendant contends that the "complete exclusion of two critical defense witnesses" is a constitutional issue that is preserved for appellate review even without its inclusion in a posttrial motion. See *People v. Cregan*, 2014 IL 113600, ¶¶ 16-20 (discussing the "constitutional-issue exception" to forfeiture). As discussed below, we need not resolve this dispute as we find that the trial court did not err.

¶ 69    "It is well settled that the granting or denial of a continuance is a matter resting in the sound discretion of the trial court, and a reviewing court will not interfere with that decision absent a clear abuse of discretion." *People v. Walker*, 232 Ill. 2d 113, 125 (2009). See also *People v. Bramlett*, 276 Ill. App. 3d 201, 205 (1995) (noting that courts should examine the following factors when reviewing the denial of a request for a continuance sought to secure the presence of a witness: (a) whether defendant was diligent in attempting to secure the witness for trial; (b) whether the defendant shows that the testimony was material; and (c) whether the failure to grant the continuance would prejudice the defendant). Whether there has been an abuse of discretion necessarily depends upon the facts and circumstances in each case. *Walker*, 232 Ill. 2d at 125.

¶ 70    Based on our review of the record, we cannot find that the trial court abused its discretion in denying a continuance. Even assuming Ta.T. would testify that she smoked marijuana before the incident, the uncontroverted evidence is that she was not in the room during the offense. Similarly, even if Yoko testified that J.A. did not report any abuse, that does not establish that such abuse did not occur. While such testimony could have called into question the veracity of

certain witnesses, the potential testimony of Ta.T. and Yoko was not material and was unlikely

to affect the outcome of the case. See *People v. Ward*, 154 Ill. 2d 272, 307 (1992) (noting that

one of the factors to be considered in reviewing the denial of a request for a continuance is

whether defendant has shown that the testimony was material and might have affected the

verdict). See also *People v. Goff*, 299 Ill. App. 3d 944, 948-49 (1998) (finding that the trial court

abused its discretion in denying the defendant's motion to reopen the case where the witness's

testimony that he observed the perpetrators of the crime – and that the defendants were not

among them – was "material to the case and may well have affected the outcome"). On a

practical level, there is no clear indication that Ta.T. or Yoko would have appeared in court and

testified as expected, even if a continuance were granted. *E.g.*, *Bramlett*, 276 Ill. App. 3d at 205

(noting that the denial of a continuance does not constitute an abuse of discretion "where there is

no reasonable expectation that the witness will be available in the foreseeable future").

¶ 71 Defendant alternatively contends that his trial counsel provided ineffective assistance by

failing to timely subpoena Ta.T. and Yoko. The United States Constitution and the Illinois

Constitution both guarantee criminal defendants the right to effective assistance of

counsel. *People v. Hale*, 2013 IL 113140, ¶ 15; U.S. Const., amend. VI; Ill. Const. 1970, art. 1,

§ 8. To establish ineffective assistance of counsel, a defendant must satisfy the two-prong test

set forth in *Strickland v. Washington*, 464 U.S. 668 (1984), demonstrating that: (1) counsel's

performance fell below an objective standard of reasonableness; and (2) there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different. *People v. Patterson*, 2014 IL 115102, ¶ 81.

¶ 72 In order to prevail on a claim of ineffective assistance of counsel, both *Strickland* prongs

must be satisfied. *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 27. Thus, if a claim of

16

ineffective assistance can be disposed of based solely on the prejudice component, we need not determine whether counsel's performance was deficient. *People v. Graham*, 206 Ill. 2d 465, 476 (2003). Where, as here, a claim of ineffective assistance was not raised in the trial court, our review is *de novo. People v. Hunt*, 2016 IL App (2d) 140786, ¶ 51.

¶ 73    As to the prejudice prong, "reasonable probability" is defined as "a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair." *Patterson*, 2014 IL 115102, ¶ 81. Satisfying the prejudice prong requires a showing of actual prejudice, not simply speculation that the defendant may have been prejudiced. *Id.* See also *People v. Evans*, 209 Ill. 2d 194, 220 (2004) (noting that a "reasonable probability of a different result is not merely a possibility of a different result").

¶ 74    Even if we assume that counsel's performance was deficient herein, we cannot find that defendant was prejudiced for the reasons stated. We further observe that there is no indication that the trial court "mechanically denied the continuance without engaging in thoughtful consideration of the specific facts and circumstances presented in this matter." *Walker*, 232 Ill. 2d at 126. Therefore, we reject defendant's alternative claim of ineffective assistance of counsel.

¶ 75                                    CONCLUSION

¶ 76    The judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 77    Affirmed.