2023 IL App (2d) 220127-U
No. 2-22-0127
Order filed June 29, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-1128 |
| ANTHONY C. MEDINA, | ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Jorgensen and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's trial counsel did not provide ineffective assistance where defendant could not show prejudice arising from the jury instruction pertaining to the 25-year firearm enhancement.

¶ 2    Defendant, Anthony C. Medina, was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)), armed violence (720 ILCS 5/33A-2(b) (West 2016)), and aggravated battery with a firearm (720 ILCS 5/17-3 (West 2016)) from a June 10, 2017, shooting resulting in the death of Rodolfo Rocha. Defendant was sentenced to an aggregate 80-year term of imprisonment, which included the 25-year firearm enhancement for personally discharging a firearm that caused great bodily harm, permanent disfigurement, or death to the victim. 730 ILCS 5/5-8-1(a)(1)(d)(iii)

(West Supp. 2017). On appeal, defendant contends that trial counsel provided ineffective assistance by not objecting to the inclusion of death in the firearm enhancement jury instruction because the evidence conclusively demonstrated that defendant did not fire the fatal shots. Because defendant cannot demonstrate prejudice arising from the jury instruction, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Early in the morning of June 10, 2017, defendant and Martin Garcia, both members of the Latin Kings street gang, approached a group of friends drinking and listening to music. Defendant and Garcia both fired multiple gunshots, causing the group to scatter. Rocha was killed by multiple gunshots to his body. On July 26, 2017, defendant was indicted for Rocha's murder along with other offenses. On January 24, 2022, the case advanced to a jury trial.[1]

¶ 5      Diana Salgado testified that, in June 2017, she and her boyfriend, Ismael, resided in a rented single-family home on Grove Street in Aurora. During the evening of June 9 and the early morning hours of June 10, 2017, friends gathered at their home to relax and socialize. Filiberto Martinez, Victor Avitia, Rocha, Luis Gamboa, and Jose Cervantes all gathered at Salgado's home. The group congregated in the driveway, using the speakers on Rocha's truck, a black Lincoln Navigator, to play music while the group talked and drank, and some of the group smoked cannabis. Salgado testified that, to her knowledge, none of her guests were in a gang, and nobody there had a gun.

¶ 6      Shortly after midnight, Salgado was outside with the group, and Rocha was standing by his truck. Other testimony suggested that the group had stopped smoking cannabis about an hour

---

[1] Defendant's pretrial motion practice did not produce any issues on appeal.

before the incident. Two Hispanic men approached the group. Salgado described that both men were wearing white shirts, and both had long hair. The man in front, later identified as Martin Garcia, had gold lettering on his shirt and wore his hair in a "slicked-back ponytail." The second man, later identified as defendant, was standing "right behind" Garcia.

¶ 7    Garcia asked the group for a lighter. Salgado testified that she was confused by the request because none of the group were smoking at the time. After being turned down, Garcia repeated his request for a lighter. After another refusal, Garcia reached into his waistband while taking a few steps backwards and asked, "What do [the group] be about?" Salgado testified that she understood that Garcia was asking about any of the group's gang affiliations. Salgado walked backwards and hurried into the house. One of the men—Salgado could not identify whom—said, "Drop the Ambro."

¶ 8    Salgado testified that she made it into the house and looked outside. She saw Martinez put his hands in the air and deny that any of the group were gang members. She saw Garcia shoot five or six rounds at a fast rate of speed and believed that he was shooting down the street. Salgado did not recall seeing defendant with a gun, but she told police in an interview shortly after the shooting that Garcia had a small black gun that resembled a toy gun.

¶ 9    Salgado called 911. At the time she called, Ismael, Martinez, and Gamboa were inside her house. A recording of the 911 call was played for the jury. During the call, Salgado was distraught, crying and yelling for the police to come. She told the 911 operator that "they" walked up to the group out of nowhere and asked for a lighter, and when her group said they did not have a lighter, the men who walked up asked about the group's gang affiliations, and the group denied any gang

membership. Salgado related that she went back to the house and "all of a sudden they started shooting."

¶ 10 Salgado testified that, as she was making the 911 call, she looked outside and saw Rocha lying on the ground. Salgado concluded her direct examination by stating that she would not be able to identify either of the men who shot at her friends.

¶ 11 Martinez testified that, on the night and morning of June 9 and 10, 2017, he attended a get-together at Salgado's house, along with his brother, Avitia, and his cousin, Rocha. Most of the group was outside when two men approached and one, whom Martinez later learned was Garcia, asked for a lighter. The group said they did not have a lighter. Martinez testified that Garcia said, "Really? You guys don't have a lighter?" The group again responded that they did not have a lighter. Martinez noted that defendant was behind Garcia, and when the group denied having a lighter the second time, defendant backed down the driveway toward the street. Garcia then asked, "What do [the group] be about?" Martinez understood Garcia to be asking what gang the group belonged to. Martinez testified that, to his own knowledge, no one in the group belonged to a gang, and nobody had a gun. Martinez identified defendant in open court as the man who was backing toward the street.

¶ 12 Martinez testified that Garcia said, "Throw down Ambro." Cervantes ran down the street to Martinez's right. Martinez and Rocha put up their hands and said they would not throw anything down and they were not gang members. Martinez explained that he knew that the Ambrose were a street gang and Garcia was telling them to disrespect the Ambrose street gang. Garcia and defendant pulled out guns, and Garcia produced a small revolver and defendant had a "shiny" gun that was not a revolver. Martinez estimated that Garcia was 5-10 feet from him when Garcia pulled

out his gun, and defendant had backed up just into the street. Martinez saw defendant shoot two shots toward the fleeing Cervantes, and he did not see defendant shoot at Rocha.

¶ 13     As the shooting started, Martinez turned and fled toward Salgado's house. As he turned, he saw Garcia shoot Rocha in the head. Martinez saw Rocha fall, and Martinez made it inside of the house.

¶ 14     A bit later in the early morning of June 10, 2017, a police officer drove Martinez to view a person the police had stopped nearby. Martinez told the officer that the person looked familiar and resembled one of the shooters. Martinez explained that he did not make a positive identification because the officer told him he had to be 100% sure of his identification. Martinez further explained that he remembered one of the shooters had black buttons on the shirt, and since he did not see those buttons on the individual at that time, he would not make an identification.

¶ 15     In the afternoon of June 10, the police presented Martinez with a photographic array. Martinez identified Garcia as looking similar to one of the shooters. On cross-examination, Martinez stated that he identified Garcia as the person who shot Rocha.

¶ 16     On August 15, 2017, police showed Martinez surveillance footage from a liquor store. The footage was captured in the evening of June 9, 2017, and depicted two men with light or white shirts. Martinez identified Garcia and defendant in the surveillance footage, and he identified them as the shooters.

¶ 17     Avitia testified that he was Rocha's cousin. Regarding the shooting, he testified that, shortly after midnight, Garcia and defendant walked up the driveway and approached the group. Avitia did not recognize defendant or Garcia. Garcia was walking in front of defendant and asked for a lighter; the group told him nobody had a lighter. Garcia then pulled out a revolver and put it

against Rocha's head, saying, "Drop the Ambrose." Avitia understood from school that Garcia meant to "drop the gang sign." Avitia related that neither he nor any in the group were gang members, and none of the group had a gun that night. On cross-examination, Avitia denied that the Rocha family belonged to the Insane Deuces street gang.

¶ 18 Avitia testified that, when Garcia drew his revolver, defendant backed up a little bit, but remained in the driveway. Avitia observed that defendant drew a semiautomatic pistol and stopped backing up while Garcia shot Rocha from about a foot away. Avitia testified that Garcia fired his weapon about three times. On cross-examination, Avitia acknowledged that his testimony to the grand jury differed from his trial testimony. Specifically, Avitia acknowledged that, in his testimony to the grand jury, he stated that he saw Rocha fall to the ground after being shot in the head, and he heard a total of six or seven gunshots. Avitia clarified the disparity, explaining that he did not count the shots, which occurred very quickly, but he could tell that two different guns were firing.

¶ 19 Avitia testified that he and the rest of the friends ran when the shooting started, and he estimated that defendant fired seven or eight gunshots. Avitia saw defendant shoot towards him, but he did not see defendant shoot at Cervantes. Avitia did not see where Cervantes ran. Avitia ran toward the garage and, when he looked back, he saw Rocha fall. Avitia observed defendant and Garcia run away. Avitia testified that he did not see Rocha or any of the group get into any sort of fight with defendant and Garcia.

¶ 20 After the shooting, at about 12:38 a.m., June 10, 2017, Avitia spoke to police. He was driven to view a show up and there, he identified defendant as the person in the driveway who was shooting, not the person who shot Rocha. Avitia also identified defendant in open court. Avitia

also identified Garcia in a photographic lineup that was conducted later at the police station. After the shooting, Avitia remembered that he had seen defendant on Facebook, and he explained that he was not Facebook friends with defendant but had been notified by Facebook that defendant may have been someone Avitia may have known.

¶ 21    The evidence also showed that, after the shooting, Garcia was taken to a nearby hospital with a gunshot wound to his abdomen. Garcia's girlfriend took him to the emergency room. Garcia had two wounds on his abdomen, and they appeared to be from a single gunshot, and the gunshot traveled shallowly across Garcia's abdomen, involving the skin and muscle of the abdominal wall and none of the underlying organs.

¶ 22    Officer Ryan Blaskey of the Aurora Police Department testified that he drove Avitia to the show-up identification of defendant. The jury was shown a recording of the show-up. Avitia identified defendant at the show-up, stating that he was not the main shooter, but defendant was the second shooter. Avitia related to Blaskey that defendant had a pistol, and the main shooter had a revolver. Avitia told Blaskey that he was "two-hundred percent sure" of his identification of defendant.

¶ 23    Officer Troy Kern of the Aurora Police Department testified that, at approximately 1:55 a.m. on June 10, 2017, he was in a squad car with Officer Matt Miracle canvassing the area around the shooting. The officers observed a man walking out of a parking area in back of a house at 462 North Farnsworth, which was several blocks from the location of the shooting. The man matched the description of one of the suspected shooters: white shirt, white pants, white shoes. Kern observed the man walk to the adjacent 466 North Farnsworth apartment building and attempt to

enter the front door, but the man was unable to open the front door of the apartment building. Kern told Miracle to stop so they could speak to the man.

¶ 24    Kern approached the man and spoke with him, determining him to be defendant. Kern searched defendant's person which yielded no contraband, but he recovered two cell phones from defendant. The officers discovered nothing of evidentiary value in the area. Kern and Miracle then held defendant in that area for witness show-ups. Kern was informed that there had been a positive identification, and defendant was taken to the police station.

¶ 25    Dr. Mitra Kalelkar, a forensic pathologist working as a medical examiner for Kane County, testified that she performed the autopsy of Rocha. Kalelkar reported that toxicology testing determined that Rocha had a blood-alcohol concentration of 0.072 and detected the presence of cocaine and cocaine metabolites in Rocha's blood. Rocha exhibited numerous bullet and bullet-fragment wounds in his head, arm, chest, and abdomen. Kalelkar testified that Rocha had been shot in the head, and that bullet entered around his left earlobe, traveled into his brain, and came to rest inside the right side of his brain. Kalelkar termed this wound as fatal, describing that Rocha would have died within minutes of receiving the wound, and perhaps as quickly as less than a minute. Kalelkar also testified that Rocha had been shot in the left abdomen, with the bullet perforating his left kidney and intestines, and coming to rest in Rocha's right back, and this too was termed as a fatal wound unless he received prompt surgical treatment to repair the damaged kidney and intestines. Rocha was also shot in the right shoulder area with the bullet lodging in Rocha's body, but this wound was nonfatal. Kalelkar concluded that Rocha died from multiple gunshot wounds. Kalelkar also noted a number of bullet fragments were embedded superficially in Rocha's chest, and she removed several of the fragments for analysis.

¶ 26    Regarding the shoulder wound, Kalelkar testified that the bullet traveled from left to right and front to back. The bullet was lodged within the muscles of Rocha's shoulder, and Kalelkar had to remove it. Kalelkar described the shoulder wound as a deep muscle wound, because the bullet did not break any of Rocha's arm bones. She testified that the bullet may have struck nerves and blood vessels as it traveled into Rocha's arm. While she believed that the wound would have proved to be nonfatal (unless it was not treated and became infected), had Rocha lived, it would have left a scar, both from the wound itself and the medical procedure to remove it.

¶ 27    Kalelkar was also shown pictures of the wounds to Garcia's abdomen. The pictures showed two bullet wounds, an entrance and exit wound. The wounds did not appear to have been inflicted at close range because there was no visible stippling around the wounds. Kalelkar cautioned that a shirt could have prevented stippling from occurring, so she could not definitively determine whether Garcia's abdominal wounds were due to a close-range gunshot.

¶ 28    Rebecca Jansen, a nurse, and Allen Bloom, a doctor, testified that they treated Garcia when he came to the emergency room. They observed that Garcia had experienced two gunshot wounds in his abdomen, above his navel. Bloom testified that it appeared that the two wounds were caused by a single gunshot, with one being an entrance wound, and the other being an exit wound. Bloom characterized Garcia's abdominal wounds as a "very minor injury."

¶ 29    Shawn McCleary, a police officer with the Aurora Police Department, testified that, on June 10, 2017, he collected evidence and photographed the scene. He collected spent shell casings at the scene. McCleary collected 12 9-millimeter shell casings fired from a semiautomatic gun. Rocha's black Navigator parked in the driveway had bullet holes in the rear tailgate. Three bullets

were recovered from the Navigator. Subsequent testing determined that there were no latent fingerprints on the shell casings.

¶ 30    Kenneth Heidemann, a police officer with the Chicago Police Department, testified that, on November 24, 2017, he tried to effect a traffic stop of two individuals. During the ensuing chase, a handgun was thrown from the fleeing car. The firearm was recovered, and testing indicated it was potentially one of the weapons used in the Rocha murder.

¶ 31    Nicole Fundell, a forensic scientist specializing in firearm identification with the Illinois State Police, testified that she examined the bullets, shell casings, and the firearm recovered in November 2017 by Heidemann. Fundell explained that a semiautomatic firearm automatically ejects the spent shell casing while a revolver retains the spent shell casings until it is manually emptied. All 12 of the shell casings recovered at the scene were fired from the same 9-millimeter Ruger pistol recovered in 2017 and which the eyewitnesses placed in defendant's hand during Rocha's murder. Fundell testified that the bullets from Rocha's head and abdomen were fired from the same weapon, which was not the Ruger. These bullets could have been 9-millimeter, .38 caliber, or .357 caliber, and they were excluded from matching all other projectiles and bullet fragments suitable for comparison recovered from Rocha and the scene. The bullet fragments recovered from Rocha's chest were not fired from the same firearm as the bullets recovered from Rocha's head and abdomen, but they were unsuitable for comparison and could not be matched with or excluded from the other projectiles. Fundell testified that the bullet recovered from Rocha's shoulder was fired from defendant's 9-millimeter Ruger pistol. Fundell also examined the three bullets recovered from Rocha's Navigator. Those three bullets were not fired from the same weapon as the bullets recovered from Rocha's head and abdomen. Two bullets were

positively determined to have been fired from defendant's 9-millimeter Ruger. The third bullet was too damaged to determine whether it matched or was excluded from the same firearm as the other bullets.

¶ 32    Christopher Coronado, a detective with the Aurora Police Department who specializes in cell phone forensics, testified that he examined the two cell phones recovered from defendant when defendant was arrested. Coronado testified that discovered that one of the phones contained calls to or from a person identified as "Goon." The record shows that "Goon" was Garcia's nickname among the Latin Kings. Coronado testified that, on June 10, 2017, between 12:58 a.m. and 1:39 a.m., defendant's phone had dialed or received six calls to or from Garcia.

¶ 33    Joseph Raschke, a special agent with the FBI working in the cellular analysis survey team, testified that he conducted an analysis of the cell towers defendant's cell phones had utilized beginning on June 9, 2017, at about 11 p.m., and continuing through June 10, 2017, until about 2 a.m. Raschke's testimony established that, on June 9, defendant was in the vicinity of the Salgado's home at about 11 p.m. He continued in the vicinity of the shooting, the nearby hospital, and the apartment building on Farnsworth where he was apprehended, making calls or text messages about 35 times during the 3-hour period. During the time on June 10, 2017, between 1 and 2 a.m., defendant made the bulk of his calls or texts using the cell tower northwest of the Farnsworth address at which he was apprehended.

¶ 34    Jeff Hahn, a sergeant with the Aurora Police Department, testified as an expert witness in gang crime investigations and identifications. Hahn testified that defendant and Garcia were members of the Latin Kings street gang. Defendant's nickname was "Yolo," and Garcia's was "Goon." Defendant had multiple gang tattoos, including a five-pointed star and "Yolo" on his

neck. At the time of the shooting, the Latin Kings were rivals with the Ambrose street gang. He noted that, in 2015, Salgado's home on Grove Street was associated with the Ambrose street gang. According to Hahn, his review of the gang records kept by the Aurora Police Department did not mention Rocha as being a member or associating with members or hangers-on of any of the local street gangs. Hahn testified that, typically, a firearm used in a shooting would be disposed of by selling it or throwing it into the Fox River. Hahn also confirmed that to "throw down" a gang sign was to disrespect the gang.

¶ 35    The State rested its case and defendant moved for a directed verdict. Defendant argued that the trial court should direct out the counts of first degree murder that alleged that defendant personally discharged a firearm because the evidence showed that any shots fired by defendant did not cause death, great bodily harm, or serious injury to Rocha. Defendant further argued that Rocha was dead by the time he was shot in the shoulder, and no rational trier of fact could find that the shoulder wound caused Rocha's death. The trial court denied defendant's motion.

¶ 36    Defendant chose not to testify. During defendant's case, he presented witnesses who testified regarding the investigation of the scene and witnesses' prior statements. Defendant rested.

¶ 37    The trial court convened a jury instruction conference. During the conference, defendant did not object to the firearm enhancement instructions or jury verdict forms. The instructions and the verdict forms included language that "the defendant personally discharged a firearm that proximately caused great bodily harm; permanent disfigurement; or death to another person."

¶ 38    During closing argument, the State argued, pertinently to the issue here, that defendant was accountable for Garcia's conduct, and was thus accountable for the murder of Rocha. At the outset of the initial discussion of defendant's accountability, the State acknowledged that the jury could

have been confused because the evidence clearly showed that Garcia had shot Rocha in the head, and the gun linked to defendant shot Rocha in the shoulder. The State provided the jury with examples and honed in on defendant's and Garcia's actions, noting that defendant "went with [Garcia to the scene] with a loaded gun," meaning that defendant was "agreeing to assist" Garcia in the offense. Further, defendant "pull[ed] out a gun when [Garcia said], drop the Ambrose," and the biggest assistance was when defendant began "shooting too, he's assisting [Garcia]." The State concluded that, "even though [defendant's] shot didn't kill Rodolfo Rocha, he's just as guilty as [Garcia], just as guilty."

¶ 39 Turning to the firearm enhancement, the State explained that, while the offense of first degree murder did not require the State to prove that defendant personally performed the act that caused Rocha's death, for the purpose of the firearm enhancement, the State was required to prove beyond a reasonable doubt that defendant personally discharged a firearm that caused great bodily harm, permanent disability, or death to another person. The State acknowledged that Garcia fired the fatal shots to Rocha's head and abdomen, and the State reemphasized that defendant bore the legal responsibility for those gunshots. The State then turned to the actions defendant performed. The State noted that the evidence showed that defendant fired the shot that wounded Rocha in the shoulder. The State concluded that, while the jury would not be instructed with a definition of great bodily harm, the evidence clearly demonstrated that defendant personally discharged a firearm, one of the shots struck Rocha in the shoulder area, many of the other shots fragmented, and those fragments were found in Rocha's chest. Regarding great bodily injury, the State left the jury with the final thought: "there's a hole in [Rocha's] arm with a bullet. That's all I'm gonna say about that."

¶ 40    Responding to the State's argument, defendant argued that he was not present during the shooting. Defendant also argued that the wound to Rocha's shoulder amounted to a "flesh wound" because Kalelkar's photographic evidence did not indicate that she had to "cut it out" of Rocha's shoulder. Defendant further argued that the wound did not cause Rocha's death and would not have caused permanent disability.

¶ 41    In the rebuttal closing argument, the State argued the gunshot to defendant's shoulder spun him to the right, causing Rocha to present the left side of his body to Garcia. The State then argued that fatal shots entered the left side of Rocha's abdomen and left side of his head. The State argued that the timing of the shots began with defendant's shot that started the "multiple gunshot wounds that caused death." The State concluded that defendant, on his own volition in the offense, "shot 12 times, hitting Rudy Rocha, Martin Garcia, and the Navigator. His bullet was one of the bullets that cause the death [of Rocha] due to multiple gunshot wounds. *** He did all of those things when he chose to walk up to [Salgado's house] that night."

¶ 42    The trial court instructed the jury regarding the firearm enhancement according to the instructions submitted during the jury-instruction conference. The pertinent language of the instructions included, "defendant personally discharged a firearm that proximately caused great bodily harm, permanent disfigurement, or death to another person." The jury returned verdicts of guilty on all counts, and it determined that the State had proven beyond a reasonable doubt all of the firearm enhancements (personal discharge of a firearm causing great bodily harm, permanent disfigurement, or death; personal discharge of a firearm; and personally armed with a firearm).

¶ 43    Defendant, via counsel, filed two motions for a new trial.[2]  The first was filed on March 1, 2022, but was withdrawn before hearing.  The second was filed on March 3, 2022, and proceeded to hearing.  In the March 3, 2022, motion for new trial, defendant did not raise any issues related to the jury instructions on the firearm enhancements.  The court denied defendant's motion for a new trial.

¶ 44    On April 14, 2022, the trial court sentenced defendant to an aggregate 80-year prison term. Defendant received a 60-year prison term for his first degree murder conviction (35 years plus the 25-year firearm enhancement; the sentence was imposed on count I and the remaining murder counts were merged), consecutive to a 20-year prison term for armed violence (to be served at 85%), and a concurrent 10-year prison term for aggravated battery with a firearm.

¶ 45    Defendant timely appeals.

¶ 46                                   II. ANALYSIS

¶ 47    On appeal, defendant contends that his trial counsel provided ineffective assistance of counsel.  Specifically, defendant argues that counsel provided deficient performance by failing to object to the instructions pertaining to the 25-year firearm enhancement, and in particular, to the inclusion of "death" in the instruction.  Defendant argues that he experienced prejudice arising from the deficient performance because the evidence clearly demonstrated that defendant did not cause Rocha's death, and had "death" been omitted from the instructions, there is a reasonable

---

[2]Defendant was represented by counsels from two separate law firms, and they each filed a motion for new trial.

probability that the jury would have determined that great bodily harm or permanent disfigurement had not been proved beyond a reasonable doubt.

¶ 48                    A. Ineffective Assistance and Standard of Review

¶ 49    A claim of ineffective assistance of counsel is considered according to the familiar test from *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant must first establish that counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. *People v. Hunt*, 2016 IL App (2d) 140786, ¶ 51. In making this determination, the defendant must first overcome the presumption that the challenged conduct was the product of sound trial strategy. *Id.* Second, the defendant must establish that prejudice. *Id.* To establish prejudice, the defendant must demonstrate that, absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. *Id.* A "reasonable probability" for purposes of an ineffective assistance claim does not mean that a different result is more likely than not, but the different result could have been reasonably returned. *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 111. The defendant must satisfy both elements of the *Strickland* test; the failure to demonstrate either deficient performance or prejudice ends our analysis and precludes a finding of ineffectiveness. *Hunt*, 2016 IL App (2d) 140786, ¶ 51. If, as here, the claim of ineffective assistance was not raised before the trial court, we review the contention *de novo*. *Id.*

¶ 50    The purpose of jury instructions is to provide the jury with the correct legal principles to apply to the evidence to allow the jury to reach a proper conclusion according to the law and the evidence. *People v. McDaniel*, 2021 IL App (2d) 190496, ¶ 53. Jury instructions, therefore, should not be misleading or confusing. *Id.* Generally, Illinois Pattern Jury Instructions (IPI),

Criminal, shall be given unless they do not accurately state the law. *People v. Bustos*, 2020 IL App (2d) 170497, ¶ 97.

¶ 51    The failure to request a particular jury instruction may constitute ineffective assistance of counsel if the instruction was so critical to the defense that its omission denied the defendant's right to a fair trial. *People v. Grabow*, 2022 IL App (2d) 210151, ¶ 21. In assessing whether the failure to give a particular instruction deprived the defendant of a fair trial, a reviewing court considers the totality of the circumstances to determine whether the defendant received a fair trial, including all the jury instructions, the parties' arguments, whether the evidence was overwhelming, and any other relevant factors. *Bustos*, 2020 IL App (2d) 170497, ¶ 98. With these principles in mind, we turn to defendant's contentions.

¶ 52                    B. Challenged Jury Instruction and Prejudice

¶ 53    Defendant argues that counsel was ineffective for failing to challenge the 25-year firearm enhancement jury instructions. Specifically, defendant contends that the evidence did not support the inclusion of the element "caused *** death to another person" in the 25-year firearm enhancement jury instructions and verdict form. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West Supp. 2017). Defendant reasons that, had death been off the table, there is a reasonable probability that the jury would have determined that Rocha's shoulder wound did not constitute great bodily harm or permanent disfigurement. We disagree.

¶ 54    The term "great bodily harm" is not specifically defined. *People v. Mimes*, 2014 IL App (1st) 082747-B, ¶ 29. However, it requires some injury of a greater and more serious nature than the injury accompanying ordinary battery. *Id.* In an ordinary battery, bodily harm requires some sort of physical pain or damage to the body, like cuts, bruises, or scrapes. *Id.* For an injury to

constitute great bodily harm, we must consider the victim's actual injuries, and the determination is not dependent upon the victim's hospitalization or the permanency of his or her disfigurement or disability resulting from the injuries. *Id.* Moreover, a gunshot wound does not necessarily constitute great bodily harm. *Id.* ¶ 32; see also *People v. Ruiz*, 312 Ill. App. 3d 49, 62-63 (2000) (gunshot wound to a police officer's knee did not constitute great bodily harm where the wound was barely visible on the day of the incident and the police officer did not immediately seek medical treatment); *People v. Durham*, 303 Ill. App. 3d 763, 770 (1999), *vacated*, 186 Ill. 2d 575 (table) (gunshot wound did not constitute great bodily harm where the evidence described it as a mark, small nick, or a cut and required no medical attention). However, instances where the bullet entered and lodged within the body have been uniformly deemed to constitute great bodily harm. *People v. Reed*, 2018 IL App (1st) 160609, ¶ 48 (bullet struck victim's right little finger and entered his right side, causing bleeding, and bullet remained in victim's body four years after the incident); *People v. Daniels*, 2016 IL App (4th) 140131, ¶ 103 (great bodily harm where a bullet enters and lodges in the victim's body).

¶ 55 Here, the bullet from defendant's gun entered and remained in Rocha's shoulder. Kalelkar described the wound: "[the bullet] perforates the skin and muscles of the area. It courses superficially through the muscles of the arm." Kalelkar explained that the term, "superficially," referred to the wound being "a muscle deep wound. [The bullet] did not strike bone," although it may have struck nerves and blood vessels located in the area of the wound. Further, Kalelkar testified that, had Rocha lived, a surgical procedure would have been required to extract the bullet.

¶ 56 Although "great bodily harm" would not have been specifically defined for the jury, the wound to Rocha's shoulder clearly constituted great bodily harm. The bullet entered and remained

lodged in Rocha's arm. *Reed*, 2018 IL App (1st) 160609, ¶ 48; *Daniels*, 2016 IL App (4th) 140131, ¶ 103. There is no reasonable possibility that a jury would have determined that the wound to Rocha's shoulder did not constitute "great bodily harm," thus satisfying the disputed element of the 25-year firearm enhancement. Because there is no reasonable possibility that the jury would have determined that defendant had not caused great bodily harm, there can be no prejudice accruing from the challenged jury instructions. Because there is no prejudice, defendant's claim of ineffective assistance of trial counsel fails. *Hunt*, 2016 IL App (2d) 140786, ¶ 51.

¶ 57    Defendant cites *Mimes*, 2014 IL App (1st) 082747-B, ¶ 32, for the proposition that a gunshot wound does not necessarily equate to great bodily harm. *Mimes* is inapposite, however, as the question presented in that case was whether the State had adequately alleged in the indictment that the defendant had personally discharged a firearm that caused great bodily harm to the victim. *Id.* ¶ 24. The appellate court expressly recognized that the defendant's "challenge on appeal is limited to the issue of notice; he does not assert that the alleged facts that he fired the gun that caused [the victim] great bodily harm were neither submitted to the fact finder nor proven beyond a reasonable doubt." *Id.* 27. Indeed, the evidence showed that the victim was shot twice in the back, was paralyzed due to a spinal cord injury from the gunshots, and had both legs amputated because of the shooting. *Id.* ¶¶ 7-8. Thus, the facts of *Mimes* show that the victim's gunshot wounds constituted great bodily harm.

¶ 58    To the extent that defendant is relying on the underlying cases supporting the proposition that a gunshot wound does not necessarily constitute great bodily harm, they are distinguishable. In *Ruiz*, the victim felt a sharp pain in his knee and later realized he had been struck by a bullet. *Ruiz*, 312 Ill. App. 3d at 63. The victim did not immediately seek medical treatment, instead, he

went to a meeting. *Id.* Finally, the wound itself was barely visible in a photograph taken on the day the victim was struck by the bullet. *Id.* The court held that the gunshot wound did not constitute great bodily harm. *Id.* Here, by contrast, the bullet fired by defendant that struck Rocha in the shoulder entered his body, was a deep wound affecting Rocha's shoulder muscles, and the bullet remained in Rocha's shoulder. Further, had Rocha not succumbed to his other injuries, an extraction of the bullet could have been accomplished only through a surgical procedure. *Ruiz* is factually distinct.

¶ 59 *Mimes* also cited *Durham*, 303 Ill. App. 3d at 770. However, the version of *Durham* cited in *Mimes* was vacated by order of our supreme court. *People v. Durham*, 186 Ill. 2d 575 (table). This court filed a new opinion in *People v. Durham*, 312 Ill. App. 3d 413 (2000). We held that the victim's gunshot wound did not constitute great bodily harm because it caused only a mark on the victim, like a small nick or cut and was evidently only a graze wound. *Id.* at 421. In this case, by contrast, Rocha's shoulder wound was not a graze wound or a nick or small cut; the bullet entered his body and lodged in the shoulder area. Removal of the bullet would have required a surgical procedure. *Durham*, therefore, is also factually distinct.

¶ 60 Defendant also argues that there was evidence that Rocha collapsed and died before he was shot in the shoulder. Defendant reasons that great bodily harm cannot be committed upon a corpse. *People v. Crane*, 196 Ill. App. 3d 264, 270 (1990) ("[o]ne cannot have knowledge that his actions threatened death or great bodily harm to a corpse"), affirmed 145 Ill. 2d 520, 527-28 (1991) (defendant's belief that victim was dead before defendant burned the victim negated any intent to cause the victim great bodily harm). Defendant suggests that "since it has been determined that one cannot know or intend great bodily harm to a dead person then there is a reasonable probability

that at least one of the jurors here would have decided that Rocha was dead at the time he was shot in the shoulder." We disagree.

¶ 61 Defendant's contention is rooted in a careful misreading of Kalelkar's testimony. Kalelkar testified that, "with the gunshot wound to the head, [Rocha] would have died immediately." Defendant seizes upon "immediately" to support his argument that he was dead or "essentially" dead when defendant shot him in the shoulder without providing the full context of Kalelkar's testimony. Kalelkar immediately (in the sense that this was the very next thing she said) elaborated on what she meant by the term, "immediately," explaining, "I wouldn't say instantaneously but within minutes." Thus, Kalelkar's direct testimony established that the gunshot to Rocha's head was fatal, causing him to expire "within minutes" but not "instantaneously." Defendant's argument is entirely premised on the misapprehension that "immediately" is synonymous with "instantaneously," despite Kalelkar's immediate (meaning the very next thing to which she testified) clarification that she did *not* mean "instantaneously."

¶ 62 On cross-examination, Kalelkar testified that Rocha's death from the gunshot to his head could have occurred within a few minutes. She further agreed that it could have been "less than a minute," and she continued to agree with defendant's question that his "death would be not instantaneous." Kalelkar also refused to agree on cross-examination with defendant's question that Rocha died within seconds after sustaining the gunshot to his head, maintaining her position and stating that Rocha "would not have lived long."

¶ 63 Defendant's argument is based on truncating Kalelkar's full testimony and disregarding how she herself clarified that testimony. We therefore reject the contention.

¶ 64    We also note that the evidence adduced showed that Garcia and defendant were both shooting their firearms at the same time.  The witnesses attempted to render a linear narrative about the jumbled, chaotic, and simultaneous event.  There was no testimony that defendant began shooting a minute or minutes after Garcia had opened fire (which would have been necessary to sustain his argument that Rocha was deceased when defendant shot Rocha in the shoulder).  Further, the evidence suggests that Rocha was shot in the right shoulder, spinning him to the right and presenting the left side of his head to Garcia, at which point Garcia delivered the fatal gunshots to the left side of Rocha's head and body.  Thus, the physical evidence also tends to refute the idea that Rocha was dead or essentially dead when defendant shot him in the shoulder.  Indeed, defendant could plausibly argue, based on the historical facts and the semantics of choice and cause and effect, that Rocha was essentially dead when defendant and Garcia approached the group.  In other words, defendant's "essentially dead" claim is literally meaningless—the evidence suggests at most that Rocha was dying but not yet dead when he sustained defendant's gunshot to his shoulder.  We reject defendant's contention.

¶ 65    Defendant argues that he established prejudice because it is reasonably probable that one juror would have determined either that the gunshot wound to Rocha's shoulder did not constitute great bodily harm or that Rocha was already dead when he sustained his shoulder wound.  Defendant argues that, so long as the odds of a different outcome are "better than negligible," he has sustained his burden of establishing prejudice, relying on *Canaan v. McBride*, 395 F.3d 376, 386 (7th Cir. 2005), and *People v. Miller*, 2013 IL App (1st) 110879, ¶ 85, quoting *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008) (" '[P]rejudice may be found even when the chance

that minimally competent counsel would have won acquittal is significantly less than 50 percent.' ''). We disagree.

¶ 66    As an initial matter, we note that decisions of the lower federal courts do not constitute binding authority in Illinois courts. *People v. Kidd*, 129 Ill. 2d 432, 457 (1989). Moreover, resort to foreign authority is appropriate when no Illinois authority exists. *People v. Bensen*, 2017 IL App (2d) 150085, ¶ 30. Manifestly, abundant Illinois authority explaining prejudice in the context of an ineffective-assistance claim exists and has long existed. *E.g.*, *Saulsberry*, 2021 IL App (2d) 181027, ¶ 111; *McCarter*, 385 Ill. App. 3d at 935.

¶ 67    Defendant apparently cites *Canaan*, 395 F.3d at 386, for the proposition that prejudice in the ineffective assistance context equates to a non-negligible chance of a different outcome. Further, defendant implies that an eight percent chance (1 juror in 12) satisfies *Canaan*. *Canaan* itself does not attempt such quantification, either overtly or through implication. Instead, *Canaan* dealt with whether the failure to present any mitigation evidence in a death penalty sentencing hearing constituted prejudice where the mitigation evidence existed, and the State had presented evidence in aggravation to support the imposition of the death penalty. *Id.* Here, the question is whether a reasonable juror could have found either that Rocha's shoulder wound did not constitute great bodily harm or that Rocha was already dead at the time he sustained his shoulder wound. As we have explained, neither conclusion is sustainable based on the evidence presented at trial. Thus, the chance of a different outcome, in the terms employed by *Canaan*, is negligible, and defendant has failed to demonstrate prejudice.

¶ 68    We also note that defendant cites *Miller*, 2013 IL App (1st) 110879, ¶ 85, in support of the Illinois standard that prejudice may be demonstrated even where the chance of a different outcome

is significantly less than 50 percent. In turn, *Miller* relied on *McCarter*, 385 Ill. App. 3d at 935, which qualified the "significantly less than 50 percent" language with "as long as a verdict of not guilty would be reasonable." Thus, Illinois authority focuses not solely on the percentage of the probability that a different result could have occurred, but on whether that different result would be reasonable. *Id.* Here, as we have explained, Illinois authority has consistently deemed a gunshot wound in which the bullet enters and lodges in the victim's body to constitute great bodily harm. *E.g.*, *Daniels*, 2016 IL App (4th) 140131, ¶ 103. Thus, the different result, namely, a determination that Rocha's shoulder wound did not constitute great bodily harm, could not have been reasonably returned. *Saulsberry*, 2021 IL App (2d) 181027, ¶ 111 (explaining that a demonstration of prejudice requires showing that the different result could have been reasonably returned).

¶ 69     Similarly, the evidence strongly suggests that, in the brief timeframe of the gunfire from Garcia and defendant, Rocha was not dead at the time he was shot in the shoulder. Kalelkar testified that Rocha would not have died instantaneously upon receiving the gunshot to the head, but it would have taken some period of time. Further, the evidence suggests that the gunshot to Rocha's right shoulder caused him to turn to his right, thereby presenting the left side of his body to Garcia, whereupon he received the fatal gunshots. Only by disregarding this evidence entirely could the jury have reached a different result, and such a result would not have been reasonable. Accordingly, we reject defendant's claim that he established prejudice.

¶ 70     Because of our resolution of the issue of whether Rocha's shoulder wound constituted great bodily harm, we need not address defendant's remaining contentions about permanent disfigurement. Likewise, because we have determined there is no prejudice accruing from the

alleged error in the 25-year firearm enhancement jury instructions, we need not consider whether that performance was deficient. Accordingly, we hold that trial counsel did not provide ineffective assistance, and we affirm defendant's sentence.

¶ 71                                    III. CONCLUSION

¶ 72    For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 73    Affirmed.